Filed 3/20/13  P. v. Siler CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ANTHONY SILER,<br><br>    Defendant and Appellant. | A132078<br><br>(Alameda County<br>  Super. Ct. No. C162290) |

Michael Anthony Siler appeals from an order following a jury trial finding him to be a sexually violent predator (SVP) under the Sexually Violent Predators Act (Welfare & Institutions Code[1] § 6600 et seq. (SVPA)) and committing him to the Department of Mental Health (DMH) for an indeterminate term.  Defendant contends:  (1) the trial court violated his Sixth Amendment right to counsel by refusing to suspend SVP until it found he had been restored to competency; (2) the trial court erred by instructing the jury on his refusal to testify; (3) the SVPA is void for vagueness; (4) there was insufficient evidence he had a qualifying diagnosed mental disorder; (5) the trial court erred by failing to instruct the jury sua sponte that they were required to unanimously agree on the qualifying diagnosed mental disorder; (6) the trial court erred by failing to instruct the jury sua sponte that an SVP commitment is for an indefinite time period; (7) the use by prosecution experts of actuarial tests in assessing his risk of reoffending violated defendant's rights to due process; (8) the DMH used an invalid evaluation protocol to

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise noted.

subject him to SVP proceedings; (9) amendments to the SVP laws under Proposition 83 (Jessica's Law) violate his constitutional rights to due process and equal protection. Having considered defendant's contentions, we conclude none have merit and, accordingly, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2009, the Alameda County District Attorney (DA) filed a petition for commitment, alleging defendant is an SVP within the meaning of section 6604 because he has suffered at least one qualifying conviction for a sexually violent offense, currently has a diagnosed mental disorder, and poses a danger to the health and safety of others due to the likelihood he will engage in sexually violent, predatory criminal behavior as a result of his diagnosed mental disorder unless he receives appropriate treatment in custody. The declaration filed in support of the petition states defendant is currently incarcerated at Mule Creek State Prison with a parole release date of December 1, 2009 and that the Director of the California Department of Mental Health (Department) has requested that defendant be civilly committed as an SVP based on the evaluations of two independent mental health professionals, Dr. Mark Wolkenhauer and Dr. Douglas Korpi. The trial court received testimony from Drs. Wolkenhauer and Korpi at a probable cause hearing held on February 26 and March 1, 2010. Thereafter, the trial court found probable cause to believe defendant is an SVP and ordered him detained pending trial.

In the pre-trial phase of the proceeding, the parties raised several issues now before us on appeal. Defendant filed a motion to dismiss the petition on the grounds that defendant's referral by the Department to the DA was based on evaluations conducted pursuant to an invalid protocol. Also, defendant filed a motion requesting a finding that he was restored to competency before the trial could proceed.[2] Alternatively, the People

---

[2] In connection with this motion, defense counsel submitted an independent forensic psychological evaluation of defendant's competency to participate in the pending civil commitment proceedings conducted by Dr. Karen Franklin. Dr. Franklin concluded defendant suffers from a severe mental disorder, with "primary symptoms including

2

filed a trial brief seeking the court's permission to call defendant as a witness if necessary. In response, defendant requested that the trial court sustain "any proper claim of the privilege against self-incrimination." In ruling on these issues, the trial court denied defendant's motion to dismiss, finding that the 2009 standardized protocol utilized by the Department complies with due process and constitutes a standard assessment protocol as required by statute. In regard to defendant's contention that the court make a finding that he was restored to mental competence in advance of trial, the court, relying on *Moore v. Superior Court*,[3] concluded there is no due process right to be restored to trial competency for purposes of SVP proceedings and, accordingly, denied the motion. Finally, the trial court ruled that defendant could be called as a witness in the People's case in chief.

When trial commenced, the People called defendant as their first witness. Defense counsel informed the court defendant intended to invoke the privilege against self-incrimination under the Fifth Amendment, and the following colloquy ensued:

"The Court: Mr. McCormick [defense counsel], it's the law . . . that in . . . a civil case that the privilege does not apply. [¶] Do you acknowledge . . . that is the law?"

[Counsel]: I do, your Honor.

The Court: Have you so advised Mr. Siler?

[Counsel]: I have.

The Court: All right. [¶] Mr. Siler, I am required to order you to come forward and be sworn as a witness, and take the witness stand. [¶] Will you comply with that order?

Defendant: I take the Fifth, your Honor: self-incrimination.

The Court: Then, I take it, that you will not comply with the order?

Defendant: I take the Fifth, your Honor: self-incrimination."

---

auditory hallucinations, a fixed persecutory delusional belief system, paranoia, racing thoughts, diminished concentration and pressured speech." She attributed the onset of these symptoms to interferon injections administered for hepatitis C in 2001, and concluded he was not competent to understand the nature of the proceedings or assist counsel.

[3]     *Moore v. Superior Court* (2010) 50 Cal.4th 802 (*Moore*).

At this point, the court ordered a recess and, out of the presence of the jury, informed defendant that if he refused to take the stand, the court would instruct the jury how to evaluate his refusal to testify. Defendant, in response to the court's admonition, invoked the Fifth Amendment. The trial resumed, however defendant refused to testify. Next, the People called a member of the DA's staff to read documents describing defendant's history of sexual offenses. The offenses chronicled for the jury began in September 1969, when defendant at age 18 entered M.A.'s residence while she was taking a shower, held a knife to her side and demanded money.[4] He then placed her naked on the bed and unzipped his pants. M.A. felt defendant's penis on her leg and started fighting and screaming. Defendant positioned his penis and hands next to M.A.'s vaginal area but did not penetrate her. Instead, defendant got off her, and M.A. fled the apartment to seek assistance. In October 1969, defendant entered H.T.'s apartment, grabbed her and demanded money. Defendant told H.T. he had been "watching [her] for a long time," hit her about the face, threw her on the bed and ripped off her clothes. Defendant climbed on top of H.T. and held a knife to her throat, at which point H.T. passed out.

The next document read to the jury described a December 1975 offense. Defendant followed R.H. as she walked home from the market. As R.H. was going into her apartment building, defendant asked her if "the Jeffersons" lived there. She directed him to the manager's unit. However, defendant followed R.H. to the third floor, grabbed her around the neck, put a knife to her throat and told her he would kill her if she screamed. He then forced her downstairs to the carport area, pushed her to her knees and demanded money. Defendant then threw R.H. onto her back, ripped off her pantyhose, called her a "bitch," and vaginally and anally raped her.

The DA staff member also read to the jury trial transcripts of witnesses' testimony describing incidents that occurred in November 1987. The transcript of K.B.'s testimony reflected on November 28 she left the Blue Dolphin restaurant in San Leandro at around

---

[4] Defendant was born on February 22, 1951.

4

2:30 a.m. and began to drive home along Marina Boulevard.  A few minutes later, defendant's car pulled alongside and defendant shouted at her to pull over.  K.B. accelerated away and defendant followed.  Defendant chased K.B. for about two miles, during which K.B. ran a red light in an attempt to escape defendant.  The chase ended when K.B. pulled into the parking lot at a Quick Stop.  Defendant approached K.B.'s vehicle on foot, informed her he was a police officer and demanded angrily that she get out of the vehicle.  K.B. refused to exit her vehicle and demanded defendant show a badge identifying him as an officer.  At this point, a friend of K.B.'s happened to pull into the parking lot, and she ran to his truck.  Defendant fled the scene and K.B. contacted the police.

The transcript of M.G.'s testimony was also read to the jury.  M.G. testified that she was driving along Marina Boulevard in San Leandro at around 2:30 a.m. on November 28.  Defendant pulled up alongside her car, honked his horn and motioned  her to pull over.  When she failed to pull over, defendant pulled in front and forced M.G.'s car to stop on the side of the road.  Defendant approached her car on foot yelling, "Did you have anything to drink tonight?"  Defendant stated he was an Oakland Police Officer and demanded M.G. exit her vehicle.  She refused and asked to see defendant's identification.  Defendant got really angry, opened the driver's door of M.G.'s vehicle and grabbed her by the neck.  M.G. accelerated away as fast as she could but defendant kept a hold of her neck while running alongside her vehicle.  After the car picked up speed, defendant let go and the door slammed closed.  M.G. looked in her rear view mirror and defendant was lying on the ground.  M.G. was bleeding from the neck.

Last, the DA read the trial testimony of M.B., recounting her contact with defendant  in the early morning hours of November 28.  M.B. testified that defendant pounded on her apartment door that morning, yelling he was a police officer and demanding she let him in because "I've got to get to Tony."  Thinking her screen door was closed securely, M.B. opened the door a crack to see defendant, at which point he forced his way in at knifepoint.  M.B. then endured a horrific assault lasting several hours.  Defendant beat her about the head, threatened to slit her throat and forced her to

orally copulate him multiple times and forced her to lick up her own vomit when she gagged on his penis. Defendant also raped M.B. multiple times both vaginally and anally. During the attack, defendant drank from a bottle of liquor and finally fell asleep holding onto the victim. Eventually, M.B. was able to free herself from defendant's grasp without waking him and fled the apartment to seek assistance from a neighbor.

The People also presented expert testimony from Drs. Wolkenhauer and Korpi. Each offered expert opinions in the areas of psychology, risk assessment and addressed the criteria for determining whether defendant was an SVP. Dr. Wolkenhauer testified that in his opinion defendant suffers from the mental disorders of paraphilia not otherwise specified (NOS), paranoid schizophrenia and he concluded that defendant suffers from antisocial personality disorder as well. Dr. Wolkenhauer defined defendant's paraphilia NOS as relating to arousal based on the dominance and non-consent of the victim. Dr. Wolkenhuar opined defendant's mental disorders predispose defendant to reoffend as an SVP if released from custody. Dr. Korpi also diagnosed defendant with the mental disorders of paraphilia NOS and paranoid schizophrenia. However, he diagnosed defendant with borderline personality disorder. Regarding his diagnosis of a sexual disorder (paraphilia NOS), Dr. Korpi opined that defendant's rape of M.B. showed indicia of sadism, placing defendant somewhere on a continuum between rapism and sadism. As sadism was evident in only one of defendant's rapes, however, Dr. Korpi decided paraphilia (NOS) was the appropriate diagnosis because "it's enough for him to have sex with women who don't want to have it." In regard to risk assessment, Dr. Korpi opined that defendant is likely to reoffend as an SVP.

The sole witness for the defense was Dr. Brian Abbott, a licensed clinical psychologist and expert in the area of forensic psychology applied to the evaluation of sexually violent predators. Dr. Abbott testified that he diagnosed defendant with paranoid schizophrenia based upon defendant's bizarre delusions that the government implanted wiring and computer chips into his body in order to control him. Dr. Abbott disagreed with Drs. Wolkenhauer's and Korpi's diagnoses defendant suffered from paraphilia NOS. Dr. Abbott testified the NOS category listed in the Diagnostic and

6

Statistical Manual (DSM) is not intended for diagnostic purposes. Rather, that diagnosis is solely intended for "for clinical convenience" in providing treatment. Dr. Abbott opined there is a lack of consensus in the professional community regarding the diagnostic criteria for paraphilia NOS, thus the diagnosis is unreliable for use in SVP proceedings. Also, he opined the actuarial tools used by Drs. Wolkenhauer and Korpi in their risk assessments of defendant's likelihood of reoffending in the future were unreliable as applied to defendant. Dr. Abbott opined defendant does not suffer from a diagnosed mental disorder that predisposes him to commit SVP crimes and, accordingly, defendant does not present a substantial risk of reoffending as an SVP.

Out of the presence of the jury and prior to completion of the evidentiary portion of the trial, the court and counsel discussed jury instructions. At one such hearing, the parties discussed the instructions the court should give to the jury regarding defendant's refusal to testify. Initially, the trial court proposed giving two instructions on this topic, one based on CALCRIM 371 (Consciousness of Guilt: Suppression and Fabrication of Evidence) and one based on Evidence Code section 413 (Failure to Explain or Deny Evidence) and defense counsel proposed the trial court use a civil instruction, BAJI 2.03. Ultimately, the parties agreed that the trial court should withdraw the instruction based on Evidence Code section 413 and instruct the jury based solely on CALCRIM 371. As given, the instruction reads: "If, by refusing to testify, the Respondent tried to hide evidence, that conduct may show that he was aware that he is a 'sexually violent predator.' If you conclude that the Respondent made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove that he is a 'sexually violent predator' by itself."

The jury after receiving the court's instructions began its deliberations on the morning of May 12, 2011, and later in the afternoon the same day delivered its verdict finding defendant is an SVP pursuant to section 6600. On May 16, 2011, the trial court filed an order for commitment pursuant to section 6600. Defendant filed a timely notice of appeal on May 18, 2011.

7

A. **The Trial Court did not violate Defendant's Right to Counsel When it Denied Defendant's Request for Temporary Suspension of Proceedings.**

Defendant contends that the trial court violated his right to due process as well as his Sixth Amendment constitutional right to effective counsel when it refused to temporarily suspend the SVPA proceedings to facilitate restoration of his competency before proceeding to trial. According to defendant, in SVP proceedings the Sixth Amendment requires the state to make "reasonable efforts, for a reasonable time, to restore competence" before proceeding to trial. Alternatively, defendant contends the court's failure to suspend SVP proceedings for some minimally reasonable period in order to facilitate his return to competence violated his right to due process. In pressing the latter contention, defendant acknowledges the California Supreme Court held, in *Moore v. Superior Court, supra,* 50 Cal.4th 802, due process was not offended by requiring a mentally incompetent defendant, while represented by counsel, to undergo a commitment trial. Nevertheless, he argues his due process claim is not foreclosed by *Moore*, because *Moore* did not consider the issue he raises here—whether a temporary suspension of SVP proceedings is required to protect his due process rights.

For the reasons set forth below, we agree with the Attorney General's argument that the Sixth Amendment is not the source of defendant's guarantee of effective assistance of counsel in SVP proceedings. Thus, the Sixth amendment provides no support for defendant's denial-of-counsel claim and, in all events, he fails to establish prejudice on this record. Instead, the source of defendant's right to counsel in SVP proceedings is statutory in nature and thus whether his statutory right to counsel was violated is properly analyzed under the due process clause. However, we conclude that defendant's due process claim is foreclosed under *Moore*. Addressing defendant's due process claim first, we note in *Moore,* the court addressed the issue of whether "the defendant in an SVP proceeding has a due process right not to be tried or civilly committed while mentally incompetent" — an issue, the court noted, "which is likely to arise in countless other cases." (*Moore, supra,* 50 Cal.4th at pp. 807-808.) The court

8

noted that "SVP proceedings are civil, not criminal in nature," therefore the constitutional rights available to criminal defendants do not apply. (*Id.* at p. 818.) However, "because civil commitment involves a significant restraint on liberty, the defendant in an SVP proceeding is entitled to certain due process protections. (Citations.)" (*Ibid.*) To determine " 'what process is due' [to] a potential civil committee" (*Moore, supra,* 50 Cal.4th at p. 819), courts balance four factors: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official. (Citations.)" (*Ibid.*)

Employing this balancing test, the court acknowledged the liberty and dignitary interests at stake in an SVP commitment proceeding are significant. (See *Moore, supra,* 50 Cal.4th at p. 824.) However, the court opined the risk of an erroneous deprivation of such interests to an incompetent SVP defendant was "relatively attenuated" because defendant plays only a minor role in SVP proceedings given "the nature of the issues, evidence, and findings in an SVP proceeding," especially the preeminent role of expert opinion in resolving the critical questions at issue. (*Moore, supra,* 50 Cal.4th at p. 824.) The risk of an erroneous deprivation of an SVP defendant's liberty and dignitary interests are further reduced, the court noted, by the "numerous procedural safeguards available to prevent an erroneous commitment in *any* SVP case, regardless of the contribution the particular defendant is willing or able to make. First, during trial, no defendant, including one who may be mentally incompetent, must proceed without "the assistance of counsel," or without "the right to retain experts or professional persons to perform an examination" on his behalf. (§ 6603, subd. (a).) . . . [A]s a general rule, such "mandatory representation," coupled with expert assistance, [is] 'generally is beneficial' to the defense. [Citation.] Other heightened statutory requirements, like jury unanimity and the

9

reasonable doubt standard of proof, help mitigate the risk that an incompetent person would be erroneously adjudicated as an SVP in the first place." (*Ibid.*) Accordingly, the court concluded "the risk-of-error" factor does not weigh in favor of finding the claimed due process right. (*Ibid.*)

Pivoting to the "most critical factor" at issue — the governmental interests that "weigh against allowing SVP's to avoid being tried or committed while mentally incompetent" — the court acknowledged the government's " 'strong interest in protecting the public from sexually violent predators, and in providing treatment to these individuals.' " (*Moore, supra,* 50 Cal.4th at p. 825.) On this factor, the court concluded "[t]he state's interest in enforcing [SVP] procedures, and in protecting the public, would be substantially impaired if an alleged SVP could claim, based on his diagnosed mental disorders, that he was too incompetent to undergo a trial leading to such targeted confinement and treatment." (*Ibid.*)

Overall, balancing the competing interests at stake, "and placing special weight on the 'paramount' interest in public safety," the *Moore* court held that "due process does not require mental competence on the part of someone undergoing a commitment or recommitment trial under the SVPA. [Citation.]" (*Moore, supra,* 50 Cal.4th at p. 829.)

Balancing the factors identified in *Moore, supra,* we reject defendant's contention that due process requires a temporary suspension in SVP proceedings to guarantee effective assistance of counsel. Defendant, as the *Moore* court stated, has significant liberty and dignitary interests at stake in the SVP proceedings. However, for the reasons articulated in *Moore*, the risk-of-erroneous-deprivation factor weighs against finding the due process right defendant presses here. (See *Moore, supra,* 50 Cal.4th at p. 824.) Likewise, as in *Moore,* "[t]he state's interest in enforcing [SVP] procedures, and in protecting the public, would be substantially impaired" (*Moore, supra,* 50 Cal.4th at p. 825) if we were to recognize the rudderless due process right advanced by defendant, which would require suspension of SVP proceedings until the state made "reasonable efforts for a reasonable time to restore competence." In sum, having balanced the factors identified in *Moore*, defendant fails to establish any meaningful distinction between the

10

claim he asserts here and the due process claim disposed of by the Supreme Court in *Moore*. Therefore, we conclude that defendant's due process claim has no merit.

Defendant's contention that the trial court's failure to temporarily suspend SVP proceedings for a reasonable period violated his Sixth Amendment right to effective assistance of counsel fares no better. We agree with defendant, *Moore* did not address specifically the Sixth Amendment claim defendant presses here. However, for the reasons set forth below, we find his Sixth Amendment claim is meritless.

In this regard, the United States Supreme Court "has long held that the Sixth Amendment grants an indigent defendant the right to state-appointed counsel in a *criminal* case[] (citation)," but the court has stated categorically that "the Sixth Amendment does not govern civil cases." (*Turner v. Rogers* (2011) 131 S.Ct. 2507, 2516.) "The categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction.' [Citation.]" (*Kansas v. Hendricks* (1997) 521 U.S. 346, 361.) However, both the high court and the California Supreme Court have held SVP proceedings are civil, not criminal, in nature. (See *Kansas v. Hendricks, supra,* 521 U.S. at pp. 361-365 [Kansas SVPA was intended to create a civil proceeding designed to protect the public from harm, as evidenced by the fact "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence," and the availability under the Act of "procedural safeguards traditionally found in criminal trials . . . does not transform a civil commitment proceeding into a criminal prosecution"]; see also *Allen v. Illinois* (1986) 478 U.S. 364, 371-372 (*Allen*) [proceedings under the Illinois Sexually Dangerous Persons Act are not "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination and the States' "decision nevertheless to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions . . . ."]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1170-1171 (*Hubbart*) [ex post facto clause "prohibits only those laws which 'retroactively alter the definition of crimes or *increase the punishment for criminal acts*[]' " and thus does not apply to the SVPA because "the Legislature disavowed any 'punitive purpose[ ],' and declared its intent to

11

establish 'civil commitment' proceedings in order to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior. (Citation.)"]; *People v. Vasquez* (2001) 25 Cal.4th 1225, 1231-1232 ["SVPA . . . is protective rather than punitive in its intent"].) Therefore, we have no trouble concluding that the the Sixth Amendment right to counsel does not apply in SVP proceedings which are civil in nature. (Cf. *Turner v. Rogers, supra,* 131 S.Ct. at p. 2516.) Accordingly, defendant's Sixth Amendment claim necessarily fails. (Cf. *People v. Fraser* ( 2006) 138 Cal.App.4th 1430, 1445-1446 ["because a civil commitment proceeding under the SVPA has a nonpunitive purpose and is therefore not equivalent to a criminal prosecution, . . . there is no Sixth Amendment right to self-representation in SVPA proceedings"].)

**B.     Defendant's Failure to Testify**

Defendant asserts that a potential civil committee in SVP proceedings has a right to refuse to testify. According to defendant, this right is founded on the right not to incriminate himself, and, more broadly, on California's constitutional right of privacy.[5] We are not persuaded.

The Fifth Amendment's guarantee against compulsory self-incrimination does not apply in the context of civil proceedings under the SVPA. (See *Allen, supra,* 478 U.S. at p. 375 [holding that proceedings under the Illinois Sexually Dangerous Persons Act "are not 'criminal' within the meaning of the Fifth Amendment to the United States Constitution, and that due process does not independently require application of the privilege]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 792 ["*Allen* [] defeats defendant's claim the district attorney was not entitled to call him as a witness in the SVPA proceedings"].) Furthermore, to establish a cognizable violation of right to

---

[5]     "Article I, section 1 of the California Constitution provides: 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*.'  [¶] The phrase 'and privacy' was added to California Constitution, article I, section 1 by an initiative adopted by the voters on November 7, 1972 (the Privacy Initiative or Amendment)."  (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15 (*Hill*).)

12

privacy under Article I, section 1 of the California Constitution defendant must demonstrate (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) a serious invasion of the privacy interest. (*Hill, supra,* 7 Cal.4th at pp. 35-37.) Assuming, *arguendo,* defendant had some legally protected privacy interest and a reasonable expectation of privacy in not testifying at his SVP hearing, defendant fails to present any evidence of disclosure or any facts that would otherwise prove he suffered a serious invasion of the purported privacy interest based upon the State's decision to call him as a witness in the SVP proceedings.

Defendant also claims the trial court erred by adversely instructing the jury regarding his refusal to testify, asserting the instruction was unwarranted as there was no evidence defendant's refusal to testify was motivated by a desire to hide evidence. Given that defendant may not invoke the protections of the Fifth Amendment in the proceedings under the SVPA (see *Allen, supra,* 478 U.S. at p. 375), we cannot say the trial court committed legal error in instructing the jury regarding defendant's failure to testify.[6]

In all events, pursuant to the jury instruction concerning defendant's failure to testify, the jury was free to decide whether defendant tried to hide evidence by refusing to testify, and, if he was hiding evidence, to decide its meaning and importance. Moreover, although the prosecutor mentioned defendant's refusal to testify in her closing argument, she did not, to her credit, argue the jury should draw the inference that by failing to testify defendant was hiding evidence pertinent to the determination whether he is an SVP.[7] Thus, even if it was given erroneously, defendant was not prejudiced by the instruction.

---

[6] Nevertheless, in light of the "tangential" relevancy of defendant's testimony to the jury's ultimate determination whether defendant is an SVP (see *Moore, supra,* 50 Cal.4th at pp. 823-824) and the fact defendant was likely psychotic and delusional, we fail to see how the dignity of the proceedings would have been enhanced by putting defendant on the witness stand; thus, the prosecutor may have been better advised to exercise the considerable discretion granted to her under our system of justice (see *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1387), and *not* call defendant as a witness in this case.

[7] Indeed, in his closing argument, defense counsel commented as follows regarding the instruction on defendant's failure to testify: "To her credit, [the prosecutor] didn't

13

## C.    Vagueness Challenge

"[T]he terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties."  (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391.)  This requirement is "consonant alike with ordinary notions of fair play and the settled rules of law.  And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. (Citations)."  (*Ibid.*)

The SVPA defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is *likely* that he or she will engage in sexually violent criminal behavior."  (§ 6600, subd. (a)(1) [italics added.)  Defendant contends the "likely" standard renders the SVPA constitutionally vague.  However, defendant has forfeited this claim because he failed to raise the claim before the trial court.  (*In re Josue S* (1999) 72 Cal.App.4th 168, 170-171 [" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' [Citation.]" [Citation.]' [Citation.]"].)  In any event, even if this issue were properly before us, we would reject it because the meaning of "likely to engage in acts of sexual violence'" was clearly explained by our Supreme Court in *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 894 (*Ghilotti*).

In *Ghilotti*, the court "conclude[d] that the phrase '*likely* to engage in acts of sexual violence' (italics added), as used in section 6601, subdivision (d), connotes much more than the mere possibility that the person will reoffend as a result of a predisposing

---

make that big a deal about it, but to some extent, it's kind of like kicking him when he's down.  The law does permit him to be called as a witness.  He didn't do what he was supposed to do.  So, okay, if you want to hold that against him, you can, but when you know the whole story, that's just an unfair thing to do."

mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is better than even. Instead, an evaluator applying this standard must conclude that the person is '*likely*' to reoffend if, *because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community*." (*Id.* at p. 922 [italics added].) Contrary to defendant's assertions, the court's clear definition of the phrase "likely to engage in acts of sexual violence" comports with due process requirements. Accordingly, we reject defendant's claim the SVPA is constitutionally vague on that ground.

**D.    Sufficiency of the Evidence Regarding Diagnosed Mental Disorder**

In order to commit defendant as an SVP, the People had to prove beyond a reasonable doubt, *inter alia,* that defendant currently suffers from a diagnosed mental disorder.[8] Regarding this element the jury was instructed the term " 'diagnosed mental disorder' includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others.' "

Defendant contends the record fails to reflect sufficient evidence he *currently* suffers from a diagnosed mental disorder because the opinions rendered by the prosecution experts primarily rely on his *past* convictions for their diagnosis of the mental disorder paraphilia NOS.[9] This contention is unpersuasive.

---

[8]    The jury was instructed that to commit defendant as an SVP, the People had to prove beyond a reasonable doubt (1) defendant committed a qualifying offense against one or more victims; (2) defendant has a diagnosed mental disorder; (3) as a result of that diagnosed mental disorder, defendant is a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior; and (4) it is necessary to keep defendant in custody in a secure facility to ensure the health and safety of others.

[9]    Defendant also contends, under a section of his brief entitled, "The Demise of Paraphilia NOS," that paraphilia NOS "fails as a sufficient 'diagnosed mental disorder'

15

First, we note past criminal conduct has a "proper role" to play in the SVPA commitment determination and thus the prosecution experts could consider defendant's past crimes in assessing whether he currently suffers from a diagnosed mental disorder. (See *Hubbart, supra,* 19 Cal.4th at pp. 1163-1164, [noting the high court "has consistently upheld commitment schemes authorizing the use of prior dangerous behavior to establish both present mental impairment and the likelihood of future harm. (citations)"].) Moreover, in forming his diagnosis, Dr. Wolkenhauer reviewed not only documents reflecting defendant's past crimes, but also reviewed defendant's medical records and interviewed defendant in person at Mule Creek State Hospital.

In forming his diagnosis, Dr. Wolkenhauer identified a pattern, or modus operandi, to defendant's offenses demonstrating paraphilic arousal based on subjecting victims to nonconsensual sex. Dr. Wolkenhauer noted several factors in support of his opinion: All of the nine victims were strangers to defendant; he was married at the time he committed the vast majority of sex offenses, suggesting his actions were based on more than a simple need for sex; and, defendant's marked persistence and lack of volitional control, demonstrated by the fact defendant committed many of the offenses while on probation or parole. Dr. Wolkenhauer also considered defendant's "hyper-sexual" behavior as a juvenile, noting he had sex with a nine year-old when he was 12 or 13 years of age and also engaged in peeping Tom activities while in junior high school. Moreover, during his interview with Dr. Wolkenhauer, defendant stated he had "a problem with lust" and Dr. Wolkenhauer noted defendant's victims ranged widely in age

within the meaning of the SVPA. This contention, however, is founded on citations to articles and correspondence that were not part of the record below, and we therefore must disregard that material in this proceeding. (*People v. Jacinto* (2010) 49 Cal.4th 263, 272–273, fn. 5 [appellate court generally not the forum in which to develop an additional factual record and reviewing courts generally do not take judicial notice of evidence not presented below but only consider matters part of record at time judgment rendered].) Moreover, " '[t]here is no duty on this court to search the record for evidence'[citation]" (*Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379), therefore we shall simply disregard this contention. (*Ibid.* [stating "an appellate court *may* disregard any factual contention not supported by a proper citation to the record [citations]"].)

16

from teenagers to older adults, demonstrating "some persistent urge." According to Dr. Wolkenhauer, although defendant has been incarcerated since 1988 he continues to suffer from paraphilia NOS because the condition is "chronic and life-long" and "doesn't just go away" and defendant had not been treated for the condition during his incarceration. In fact, defendant specifically declined sex offender treatment.

Dr. Korpi, the other prosecution expert, stated the criteria for paraphilia NOS are (1) a person has fantasies, urges or behaviors concerning sex with nonconsenting adults for a period of more than six months and (2) the person's fantasies, urges or behaviors concerning sex with nonconsenting adults causes substantial disruption in that person's life. According to Dr. Korpi, to determine if a person has paraphilia NOS, "you tend to look at it chronologically[,] . . . from when they were a baby to where they are now, and look at how the person develops." Dr. Korpi identified critical incidents from defendant's chronology in support of his diagnosis of paraphilia NOS. First, as a juvenile, defendant told a probation officer he "gets increased sexual stimulation in precarious situations when he has sex with older girls"; defendant had sex with a nine year old girl when he was 12 years old; defendant engaged in peeping Tom behavior in junior high school; and defendant engaged in incidents of indecent exposure. According to Dr. Korpi, defendant's behaviors as a juvenile "could be early signs of symptoms of a sexual disorder."

The next point in defendant's chronology is September 1969 when defendant was 18 years old and suffered a conviction for assault-to-commit rape of a 20-year old victim. Korpi thought because defendant asked for money this may have been a robbery and because defendant ran off when the victim screamed, "maybe this is a guy who really doesn't like rape." Shortly thereafter, in October 1969, defendant was arrested for assault to commit rape. The fact this arrest occured while defendant was on bail for the September 1969 offense made Dr. Korpi think for the first time that "we might have something; that there's something wrong with him." Also, defendant told the October 1969 victim, "I've been watching you for the longest time," indicating stalking, planning, and sexual anticipation. And the fact defendant pulled down his pants and

17

pulled off the victim's clothes means he's now "thinking about rape." Only six days later, defendant was charged with indecent exposure and battery after trying to drag a woman into his car, indicating "there's some driving force going on here." Next, Dr. Korpi noted after defendant pleaded guilty to the above offenses, he told a prison psychiatrist "rape is on my mind," admitted he is a mentally disordered sex offender and requested treatment, suggesting defendant was "looking for explanations why he did this" and had "genuine concern[s]" about himself.

According to Dr. Korpi's diagnosis, the next significant point in defendant's chronology is June 1973, after defendant was released from prison. Only eight months later, while still on parole, defendant was charged with rape of a 15-year-old girl; the girl alleged defendant gave her a ride, stopped near her home, locked the car, and threatened her with a crow bar before raping and sodomizing her. However, the district attorney did not press charges because the victim did not want to prosecute. Dr. Korpi stated he was not "absolutely sure" if defendant suffered from paraphilia at this point in the chronology, but he was "getting very close" to that conclusion.

The next point on the chronology, Dr. Korpi stated, "is where I make my diagnosis." Seven months after his release from prison, and while on parole for the sexual assault of the 15-year-old hitchhiker, defendant raped and sodomized a 20-year-old woman in the carport area of her apartment block after taking her at knifepoint from the entrance to her third floor apartment. Dr. Korpi opined that a pattern to defendant's sexual crimes had now emerged, including use of a knife to threaten the victim and anal rape. Dr. Korpi stated: "Most rapes . . . a guy who goes in an apartment . . . rapes a woman and leaves. He doesn't rape and sodomize her. That's overkill; too much is going on. And he does[] it in a public area, right behind the darn apartment building where you can get easily caught. This compulsion has taken him over. We now know he's got the disorder." He further opined defendant is "clearly aroused" by his victims' lack of consent, as evidenced by the fact he maintains an erection while raping his victims vaginally and anally.

18

Subsequent events in defendant's chronology confirmed Dr. Korpi's diagnosis of paraphilia, specifically, after defendant was released from prison in 1980, he was arrested in 1987 for 40 sex offenses against four different victims. Dr. Korpi testified the fact defendant did not offend between 1980 and 1987 did not affect his diagnosis of paraphilia; rather, it merely showed defendant, like an alcoholic, had managed to control his behavior for a time but ultimately "he could not contain[] the monster."

In forming his diagnosis Dr. Korpi also considered defendant's reaction to his crimes; he opined defendant has a "conscience" and regrets his inability to control his impulses. In this regard, Dr. Korpi noted that when defendant went to the hospital as a MDSO in the 70's, "he wanted treatment and he wanted an explanation." Later, defendant blamed drugs for his behavior and his current explanation is that he is controlled by computer chips implanted in his body that unleash anger, lust and violence. According to Dr. Korpi, this indicates defendant "has a disorder, that he wishes he doesn't have, and he can't control it and it's something he's going to have to deal with." Dr. Korpi opined defendant currently suffers from paraphilia because "it's an orientation . . . [defendant] likes . . . coercive sex. It doesn't go away." Treatment may prevent the behavior associated with paraphilia but cannot cure the affliction itself.

The evidence presented at trial by the prosecution's expert witnesses was " ' "reasonable in nature, credible and of solid value" ' [Citation]." (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) Drs. Wolkenhauer and Korpi based their diagnoses of paraphilia NOS on defendant's personal history and a detailed evaluation of the type, nature and pattern of the offenses constituting defendant's long history of sexual assaults and attempted sexual assaults. The key factors identified by Drs. Wolkenhauer and Korpi in support of their diagnoses included: defendant's hyper-sexual behavior as a juvenile; defendant's choice of forced sex during a time he was married and had the opportunity of consensual sex; the fact he not only vaginally raped but also anally raped his victims; his sexual arousal in the face of his victims' distress and lack of consent; the "persistent urge" or compulsion underlying his behavior as evidenced by the wide range in the ages of his victims and his disregard for the risk of detection; and the fact defendant sought

19

treatment as a MDSO, his admission to having a "problem with lust" and his need to explain his behavior all show defendant realizes and is aware of his condition. In sum, the testimony rendered by Drs. Wolkenhauer and Korpi constitutes substantial evidence in support of the jury's finding that defendant suffers from paraphilia NOS. (See *People v. Mercer, supra,* 70 Cal.App.4th at p. 466 [substantial evidence standard applies to a challenge to an SVPA commitment on sufficiency of the evidence grounds].) Accordingly, we conclude the jury's finding on that point must be affirmed. (*Ibid.* [appellant court must "review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below"].)

## E.     Jury Instructions

Defendant contends that the trial court committed prejudicial error by failing to instruct the jury, sua sponte, they were required to unanimously agree on the specific mental disorder qualifying him as an SVP. Defendant bases his contention on the unanimity rule applicable in criminal proceedings. The unanimity rule provides that "[w]here the evidence shows that several criminal acts may have been committed and the defendant is not charged separately with a violation of all those acts, the trial court is required, sua sponte, to instruct the jurors that they must unanimously agree beyond a reasonable doubt upon the particular act constituting the crime. [Citations.] The purpose of this rule is to insure that all jurors agree beyond a reasonable doubt that one particular act or acts constitute the crime charged. [Citations.]" (*People v. Washington* (1990) 220 Cal.App.3d 912, 915.)

However, "[a]n SVP proceeding is civil, not criminal, and the unanimity requirement for an SVP proceeding is established by statute. [Citation.] Under the SVPA, the jury must determine whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt' and the jury's *verdict* must be unanimous. [Citations]." (*People v. Carlin* (2007) 150 Cal.App.4th 322, 347.) Nevertheless, whereas the jury's verdict must be unanimous, "[t]here is no statutory requirement regarding unanimity for each subpart of the SVP determination." (*Id.* at p. 347 [rejecting claims that the trial court erred in failing to instruct the jurors that they

20

must unanimously agree on which prior convictions involved substantial sexual conduct and on which acts constituted substantial sexual conduct]; see also *People v. Fulcher* (2006) 136 Cal.App.4th 41, 59 [concluding that because "SVP proceedings are civil in nature, even though some criminal procedural protections apply, the rule requiring a unanimity instruction does not apply in SVP civil commitment proceedings. [Citations]"].) Accordingly, because the trial court adequately instructed the jury on each of the elements of defendant's civil commitment (see *ante* fn. 8), the court did not commit prejudicial error by failing to give a unanimity instruction sua sponte on the "diagnosed mental disorder" element.

Next, defendant contends the trial court should have instructed the jury sua sponte that a true finding defendant is an SVP would result in his indefinite commitment, rather than the renewable, two-year commitment he would have received under a prior version of the SVPA.[10] Defendant argues that failing to instruct the jury on the consequences of its true finding "may give them the mistaken impression that a civil commitment is short term and allows for real review in the future." This contention is baseless.

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 115-116.) At defendant's SVP trial, the jury was asked to determine, based on the evidence presented by the parties, whether defendant is an SVP and, if so, whether he was likely to reoffend if released into the community. The trial court properly instructed the jury on the principles of law governing its resolution of those issues. The duration of any commitment imposed

---

[10] Prior to 2006, a person determined to be an SVP was committed to the custody of the Department of Mental Health for a period of two years; to keep an SVP in custody beyond the initial two year term, the People were required to file a new petition to extend the commitment and again prove to a jury beyond a reasonable doubt that defendant is an SVP. (See *Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1280-1281.) In 2006, SVPA was amended by statute and voters' initiative (Proposition 83, known as Jessica's Law) to provide that SVP's be committed by the court to the Department of Mental Health (department) for an indefinite period of time rather than the renewable two-year commitment provided for under existing law. (*Ibid.*)

21

subsequent to the jury's findings was irrelevant to the issues at trial. Accordingly, the trial court was not required to instruct the jury sua sponte regarding the consequences of an SVP finding.

## G.    Evidence on Whether Defendant's Mental Disorder is Treatable

Defendant contends his commitment under the SVP statute violates due process where, as here, the evidence failed to establish his mental disorder is treatable. Defendant also argues he will never achieve mental health as an adjudicated SVP because he is not being provided appropriate treatment. In particular, he asserts Coalinga State Hospital, where he is confined, utilizes a five-phase "cognitive-based therapy" which is an inappropriate treatment modality for a patient who "is incompetent and delusional."

Our Supreme Court rejected a similar "treatment based" due process challenge to the SVPA in *Hubbart, supra*. There, defendant asserted that involuntary confinement as an SVP violates due process "unless it is coupled with a statutory guarantee of treatment providing 'a realistic opportunity to be cured.' " (*Hubbart, supra,* 19 Cal.4th at p. 1164.) "At the outset," the court rejected the suggestion "that the Legislature cannot constitutionally provide for the civil commitment of dangerous mentally impaired sexual predators unless the statutory scheme guarantees and provides 'effective' treatment." (*Ibid.*) Indeed, after examining high court precedent on civil commitment of SVP's, the court concluded "there is no broad constitutional right of treatment for persons involuntarily confined as dangerous and mentally impaired, at least where 'no acceptable treatment exists' or where they cannot be 'successfully treated for their afflications.' " (*Id.* at p. 1166.) Accordingly, we conclude defendant's contention is foreclosed by *Hubbart.*[11]

---

[11]    Defendant cites *People v. Feagley* (1975) 14 Cal.3d 338 (*Feagley*) in support of his treatment-based due process argument. In *Feagley,* the California Supreme Court invalidated the now-repealed procedure under which the defendant was committed as a mentally disordered sex offender (MDSO) on the grounds that it resulted in a complete denial of treatment under conditions of confinement so punitive as to constitute "cruel and unusual punishment." (*Id.* at p. 376.) However, in *Hubbart, supra*, the court stated

**H.     Experts' Use of Actuarial Tests in Assessing Risk of Reoffending**

Defendant contends the prosecution experts' reliance on actuarial tests to assess his risk of reoffending violates due process,[12] relying on *People v. Burnick* (1975) 14 Cal.3d 306 (*Burnick*).  In *Burnick*, the California Supreme Court was "called upon to determine the proper standard of proof in mentally disordered sex offender proceedings." (*Id.* at p. 310.)  The court held that "in order to comply with the requirements of the due process clauses of the California and federal Constitutions, so drastic an impairment of the liberty and reputation of an individual must be justified by proof beyond a reasonable doubt." (*Ibid.*)

Defendant acknowledges *Burnick, supra,* addresses the issue of the applicable burden of proof, however he claims the use of actuarial instruments by psychologists in assessing the probability of an SVP defendant reoffending raises the same concerns of "grievous error[]" that led the *Burnick* court to require proof beyond a reasonable doubt for mentally disordered sex offender proceedings.  This claim has no merit.

---

"nothing in *Feagley* [] requires invalidation of the SVPA based on its treatment provisions." (*Hubbart, supra,* 19 Cal.4th 1167, fn. 29.)

[12]     Defendant also contends that the use of actuarial scores by the psychologists constitutes the sort of "improper profile evidence" we identified in *People v. Robbie* (2001) 92 Cal.App.4th 1075 (*Robie*).  In *Robie*, at defendant's trial on charges of kidnapping for sexual purposes, the prosecution presented expert testimony that defendant's behavior during the commission of the crime was consistent with the conduct of a rapist. (*Id.* at p. 1081.)  On appeal, we reversed defendant's conviction on the grounds the expert testimony constituted improper profile evidence, a profile being "a collection of conduct and characteristics commonly displayed by those who commit a certain crime." (*Robie,* 92 Cal.App.4th at p. 1084.)  We noted profile evidence "is generally inadmissible to prove guilt" (*id.* at p. 1084), as it invites the jury to conclude, based on the premise that only criminals act in a given way, that defendant committed a crime because he matches the profile. (*Id.* at pp. 1085-1086.)  Moreover, we concluded admission of the expert testimony was not harmless because the defendant and the victim "gave starkly conflicting versions of events." (*Id.* at p. 1087.)  However, the analogy defendant attempts to draw between using improper profile evidence to determine a defendant's guilt at a criminal trial, and using psychological testing to assess a defendant's risk of reoffending for purposes of an SVP determination, is entirely specious, and we reject it.

Defendant received all the "sturdy bulwarks of procedure" set forth in *Burnick*, namely, "a trial by jury, [] the assistance of counsel, [] the right to retain experts . . . to perform and examination on his or her behalf, and to have access to all relevant medical and psychological records and reports." (*Burnick, supra,* 14 Cal.3d at p. 310; § 6603, subd. (a).) Moreover, the jury was instructed the fact that a petition to declare defendant an SVP has been filed "is not evidence the petition is true. You must not be biased against [defendant] just because the petition has been filed and this matter has been brought to trial. The Petitioner is required to prove the allegations of the petition are true beyond a reasonable doubt." The jury was further instructed that the standard of proof beyond a reasonable doubt applies to all the elements required for an SVP determination, including the finding that "as a result of that diagnosed mental disorder, [defendant] is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior." In sum, the record demonstrates defendant's SVP proceedings and the trial court's instructions thereon fully comported with the requirements of due process. Aside from his speculation as to how the jury utilized the opinions provided by the prosecution experts, opinions based in part on actuarial assessments, defendant has failed to establish a factual or legal basis for reversal on this ground.

## I.      Department of Mental Health Protocol for Expert Evaluations

Section 6601 governs referral of persons currently incarcerated for SVP evaluation prior to release from incarceration. It provides in pertinent part: "The State Department of Mental Health shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

As noted above, defendant filed a pre-trial motion to dismiss the SVP petition on the grounds that his referral by the Department to the DA was based on evaluations conducted pursuant to an invalid protocol.  The trial court denied the motion, finding that the 2009 standardized protocol utilized by the Department to evaluate defendant complied with due process and met the statute's requirements for a valid protocol.  On appeal, defendant contends that guidelines devised  by the Department of Mental Health in 2009 do not track the specific requirements described in Section 6601, and therefore fail to qualify as  a "standardized assessment protocol."  We reject defendant's argument because he fails to establish prejudice based upon the use of an invalid assessment protocol.

In *People v. Pompa–Ortiz* (1980) 27 Cal.3d 519, 529 (*Pompa–Ortiz*), the California Supreme Court held illegalities in criminal preliminary hearings that are not "jurisdictional in the fundamental sense" are not reversible per se on an appeal following trial.  (*Id.* at p. 529.)  Rather, such illegalities must be reviewed "under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination."  (*Ibid.*)  Moreover, under *Pompa–Ortiz*, "[t]he right to relief *without any showing of prejudice will be limited to pretrial challenges of irregularities*. At that time, by application for extraordinary writ, the matter can be expeditiously returned to the magistrate for proceedings free of the charged defects."  (*Pompa–Ortiz, supra,* 27 Cal.3d at p. 529, italics added.)  " 'In other words, a defendant who feels he has suffered error at his preliminary hearing can seek to correct that error by filing a pretrial writ petition. If he does not, and elects to go to trial, the error at the preliminary hearing can only lead to reversal of the conviction if the error created actual prejudice.' " (*People v. Ronje* (2009) 179 Cal.App.4th 509, 517 (*Ronje*), quoting *People v. Hayes* (2006) 137 Cal.App.4th 34, 50)  Furthermore, "[t]he *Pompa–Ortiz* rule apples to denial of substantive rights and technical irregularities in proceedings, and to SVPA proceedings. [Citations]."  (*Ronje, supra,* 179 Cal.App.4th at p. 517.)

25

In this case, assuming *arguendo* the 2009 protocol is invalid as asserted by defendant, the use of evaluations based on the protocol did not deprive the trial court of fundamental jurisdiction over the SVPA commitment petition. (See *Ronje, supra,* 179 Cal.App.4th at p. 518; accord, *People v. Medina* (2009) 171 Cal.App.4th 805, 816 [concluding defendant's argument that court lacked jurisdiction because section 6601 evaluations were not conducted pursuant to a valid protocol "is an argument that the court acted in excess of its jurisdiction, rather than without fundamental jurisdiction"].) Moreover, as mandated by *Pompa Ortiz*, defendant did not seek writ relief after the trial court denied his motion to dismiss the SVP petition for lack of valid evaluation protocol. Accordingly, the judgment may be reversed for use of an inadequate evaluation protocol ground only upon a showing of prejudice. (*Pompa–Ortiz, supra,* 27 Cal.3d at p. 529; *Ronje, supra,* 179 Cal.App.4th at pp. 517-518; *People v. Hayes, supra,* 137 Cal.App.4th at p. 50.)

This he cannot do. In analyzing the issue of prejudice it is important to note that defendant does not contend the report prepared by Dr. Wolknehaur or Dr. Korpi based on the 2009 protocol was infected by legal error, i.e., "on its face, it reflects an inaccurate understanding of the statutory criteria governing the evaluation." (*Ghilotti, supra,* 27 Cal.4th at p. 913 [noting defendant may file a pleading challenging an SVP petition's validity on grounds that a report is "infected by legal error"].) We also note defendant was represented by counsel, presented his own expert witness, cross-examined the People's witnesses, and, after a full, public trial, a jury unanimously found he was an SVP by proof beyond a reasonable doubt. (Cf. *People v. Hayes, supra,* 137 Cal.App.4th at p. 47 [defendant failed to demonstrate that he was prejudiced by trial court's failure to hold a probable cause hearing at the outset of the case] and *People v. Butler* (1998) 68 Cal.App.4th 421, 435 [reversal not warranted where defendant failed to seek pretrial review of the trial court's failure to provide a full probable cause hearing and failed to demonstrate prejudice thereby because "he was found to be an SVP after a trial at which he was able to cross-examine the prosecution's witnesses and call his own witnesses"].) In sum, even assuming the 2009 protocol does not comply with section 6601, as asserted

by defendant, reversal is not warranted because defendant has failed to articulate a basis to find the protocol used here resulted in prejudice impacting his ability to obtain a fair trial. (See *Pompa–Ortiz, supra,* 27 Cal.3d at p. 529.)

## J. Proposition 83

As noted above, the SVPA was amended in 2006 by Proposition 83, known as Jessica's Law, to provide that SVP's be committed by the court to the Department of Mental Health (department) for an indefinite period of time rather than the renewable two-year commitment provided for under existing law. Defendant contends that the post-Proposition 83 SVPA violates his constitutional rights to due process, to be free from ex post facto application of the law, and to equal protection. We address these claims in turn.

Defendant contends Proposition 83 violates both his constitutional right to due process, because it "unconstitutionally imposes on him the burden to prove by a preponderance of the evidence that he is entitled to release" after being committed as an SVP, and the federal constitutional prohibition against ex post facto laws, because it is punitive and was applied to his conduct prior to its enactment. As defendant acknowledges, these contentions were considered and rejected by our Supreme Court in *McKee.* (See *McKee* (2010) 47 Cal.4th 1172, 1191, 1195.) We are bound by the decisions of our Supreme Court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Therefore, we reject defendant's due process and ex-post facto claims.

Last, we turn to defendant's contention his involuntary SVP commitment violates his federal constitutional right to equal protection under the law because it treats him significantly less favorably than similarly situated individuals civilly committed under other statutes, such as mentally disordered offenders (MDOs). In *McKee, supra*, the Supreme Court found SVP's and MDOs are similarly situated because, *inter alia,* both " 'have been found, beyond a reasonable doubt, to suffer from mental disorders that render them dangerous to others, . . . [a]t the end of their prison terms, both have been civilly committed to the Department of Mental Health for treatment of their disorders

27

[and] . . . the purpose of the MDO Act and the SVPA is the same: to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' [Citations.]"[13] (*McKee, supra,* 47 Cal.4th at p. 1203.) The court concluded the disparate treatment afforded SVP's and MDOs under the law, whereby SVP's suffer indefinite commitment and carry the burden of proving they should no longer be committed and MDOs are subjected to short-term commitment renewable only if the People prove periodically that continuing commitment is justified beyond a reasonable doubt, "raises a substantial equal protection question that calls for some justification by the People."[14] (*Ibid.*) Accordingly, the court remanded the case to the trial court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain a release from commitment" and stated the trial court may permit expert testimony on that issue if appropriate. (*McKee, supra,* 47 Cal.4th at pp. 1208-1209.)

The remand ordered by the Supreme Court resulted in a 21–day evidentiary hearing and a subsequent finding by the trial court in *McKee* that the People met their burden to justify the disparate treatment of SVP's. (See *People v. McKee* (2012) 207 Cal.App.4th 1325, 1330 (*McKee II*).) Moreover, in our recent opinion, *People v. McKnight* (2012) 212 Cal.App.4th 860 (*McNight*), we concluded *McKee II* was dispositive of McKnight's equal protection claim against the SVPA. We noted the Fourth District in *McKee II* concluded that SVP's are differently situated than MDO's

---

[13] Because the general population of criminal inmates share none of the characteristics which the *McKee* court identified as common to MDOs and SVP's, they are not similarly situated to SVP's for equal protection purposes. Accordingly, we reject defendant's contention that Proposition 83 violates equal protection because inmates receive more favorable treatment under Penal Code section 3041 in the setting of parole release dates.

[14] The *McKee* Court also concluded SVP's are similarly situated to persons found not guilty by reason of insanity (NGI) and that a comparison of the SVPA and NGI scheme raised similar equal protection problems as those discussed in relation to MDOs. (*McKee, supra,* 47 Cal.4th at p. 1207.)

28

and NGI's, and their different treatment under the Act is necessary to further compelling state interests." (*McNight, supra,* 212 Cal.4th at pp. 862-864.)

Moreover, we rejected McKnight's contention that the Supreme Court's post *McKee I* remand resolved the equal protection claim only as applied to Mr. McKee. "*McKee I* recognized that the People could attempt to justify the Act's disparate impact in a variety of ways, and that these included showing that SVP's as a class are significantly more likely to reoffend than MDO's or NGI's, showing they pose a greater risk to children (in which case the equal protection analysis would apply only to child predators), or by other, unspecified means. (*McKee I, supra,* 47 Cal.4th at p. 1208.) In light of that recognition, the court transferred the multiple 'grant and hold' cases under *McKee I*, including this one, to the Courts of Appeal with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final, '*in order to avoid an unnecessary multiplicity of proceedings*.' (Citing cases.) On remand, *McKee* concluded that differences between SVP's *as a class* and other offenders justify their different treatment under the Act. It is plain that *McKee II* is not to be restricted to Mr. McKee alone or only to those SVP's convicted of crimes against children, . . . but rather its holding applies to the class of SVP's as a whole." (*McNight, supra,* 212 Cal.4th at pp. 863-864.)

Agreeing with the Fourth District's equal protection analysis, "[w]e therefore concluded that McKnight's recommitment under the SVPA does not violate his equal protection rights." (*McNight, supra,* 212 Cal.4th at p. 864.) For the same reasons, we conclude in this case that defendant's recommitment under the SVPA does not violate his equal protection rights.[15]

---

[15] Defendant also contends reversal is warranted on grounds of cumulative error. However, as in *People v. Cole* (2004) 33 Cal.4th 1158, " '[w]e have either rejected on the merits defendant's claims of error or have found any assumed error to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.' " (*Id.* at pp. 1235-1236.)

## DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.

30